IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| Lani E. Clark, | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 1:19-CV-00198-LY |
| | § | |
| | § | |
| Lois Kolkhorst, Texas State Senator, | § | |
| in her individual capacity and in her | § | |
| official capacity, | § | |
| *Defendant.* | § | |

---

### DEFENDANT LOIS KOLKHORST'S MOTION FOR SUMMARY JUDGEMENT

---

Defendant Lois Kolkhorst, Texas State Senator, respectfully seeks summary judgment on Plaintiff Lani E. Clark's First and Fourteenth Amendment claims. For the reasons discussed below, Plaintiff does not have a First or Fourteenth Amendment right to post to or comment on Defendant Kolkhorst's campaign Facebook page. Accordingly, Plaintiff's claims should be dismissed.

### INTRODUCTION

Incumbent officeholders do not stop campaigning once they are in office. A politician cannot rest on her laurels. She must continue to engage with her supporters, expand her base, and convey to her constituents why they should support her the next time she is on the ballot. That campaigning is core First Amendment speech. So too is the right to exclude antagonistic viewpoints that undermine the campaign's message. No one would seriously contend, for example, that when President Bush or President Obama campaigned for reelection, they were required to include messages hostile to their accomplishments in office on the campaign mailers they distributed across the county. This case requires only that the Court apply those foundational principles to a more modern medium: a

campaign Facebook page. Plaintiff seeks to compel Texas State Senator Lois Kolkhorst to display messages on her personal campaign Facebook page that are anathema to the Senator's campaign message. Because the First Amendment does not countenance Plaintiff's efforts to foist undesired speech on a private campaign, this case should be dismissed.

## STATEMENT OF FACTS

**A.     Facebook provides a platform for all users, including candidates for office.**

Facebook is a popular social-media platform that allows users to share messages, promote their ideas or businesses, and communicate directly with other users. *See* Doc. 14 ¶ 29; *Morgan v. Bevin*, 298 F. Supp. 3d 1003, 1007 (E.D. Ky. 2018) ("Facebook is an online social media platform that allows users to create their own individual user profiles for the purpose of connecting and interacting with others."). As Facebook explains, "[p]ages are for businesses, brands, organizations and public figures to share their stories and connect with people." *See How do I create a Facebook page?*, FACEBOOK, (last visited July 16, 2020), https://www.facebook.com/help/104002523024878. These pages serve as platforms for expression that enable the user to curate an online identity and spread messages by posting status updates, publishing "notes" (akin to blog posts), uploading photos, and "sharing" other users' posts on the user's own page. *See generally Tips for Using Facebook Notes*, FACEBOOK, (last visited July 16, 2020), https://www.facebook.com/facebookmedia/blog/tips-for-using-facebook-notes.

Facebook encourages "people and organizations involved in politics to create a Facebook page," including politicians running for office, elected officials, and governmental entities. *See Facebook for Government, Politics and Advocacy: Learn the Basics*, FACEBOOK, (last visited July 16, 2020), https://www.facebook.com/gpa/learn-the-basics. Many prominent politicians, including current and former candidates for President, have established Facebook pages to connect with their supporters, as a Facebook page provides campaigns with a critical outreach tool. *See id.* (a page "is a public presence

designed for connecting with people at scale who you may or may not know personally – whether as a candidate, elected official government or political organization.").

In 2017, some three years after the creation of the Kolkhorst campaign page, Facebook also launched a feature called "Town Hall," which allows Facebook users to "[f]ind, follow and contact their government officials." *See How do elected officials get added to Town Hall on Facebook?*, FACEBOOK, (last visited July 16, 2020), https://www.facebook.com/help/479292349083513. The Town Hall feature allows users to identify politicians and government officials in their area by entering their address, which Facebook cross-references against public databases or Facebook pages that are set to "Politician" or "Government Official." *See What is Town Hall*, FACEBOOK, last visited July 16, 2020), https://www.facebook.com/help/278545442575921. The Kolkhorst campaign has not taken any affirmative steps to "opt in" to the Town Hall so as to encourage any constituents to connect with her through her campaign Facebook page. *See* Exhibit A, Declaration of Matthew Russell, ¶ 8.

Facebook users can also offer "comments" on other users' pages, subject to the control of those pages' administrators. Facebook gives administrators wide power over their pages' content, including the ability to remove third-party comments or block other users. *See* Doc. 14 ¶ 29; Help Center: How Do I Hide or Delete a Comment from a Post on My Page, FACEBOOK,  (last visited July 16, 2020), https://www.facebook.com/help/297845860255949; *see also Bevin*, 298 F. Supp. 3d at 1007 ("A Page administrator can delete a comment or post; when a comment or post is deleted, it's gone completely and there is no record of its existence.").

**B.    Kolkhorst established a campaign Facebook page to support her campaign for the Texas Senate.**

Lois Kolkhorst is a fifth-generation Texan, with familial roots in this State dating back to the Texas War of Independence. *See Senator Lois Kolkhorst: District 18*, (last visited July 16, 2020), https://senate.texas.gov/member.php?d=18. In 2000, she was elected to the Texas House of

Representatives, where she served seven terms. *See id.* After serving for seven terms in the House, in 2014, Kolkhorst was elected to the Texas Senate in a special election, in the process becoming only the 17th woman to serve in the Texas Senate since 1845. *Id.* She assumed office as the Senator for District 18 on December 22, 2014, where she represents over one million constituents and hears from many of them on a daily basis. *See Legislative Reference Library of Texas*, (last visited July 16, 2020), https://lrl.texas.gov/legeLeaders/members/memberdisplay.cfm?memberID=195#terms.

In advance of that election, her campaign established a Facebook page to support her candidacy for the Texas Senate. *See* Ex. A ¶ 3. From its creation, and at all times since, Kolkhorst's campaign staff have been the exclusive operators and support staff for the page. *Id.* Although some individuals work both in the Senate office and for the campaign, these are independent positions, which are paid separately; Senate employees have no role or responsibility in regard to the campaign Facebook page as part of their jobs for the Senate office. *Id.* Over the last six years, the campaign has paid a consultant, Vici Media Group, thousands of dollars to manage the Facebook page as a means of garnering support for Kolkhorst's election, and ongoing re-election, to office. *Id.* ¶ 4. Facebook alerts users to the fact that the "Page Owner" of the page is the Lois W. Kolkhorst Campaign. *See* Exhibit B, Page Transparency, Lois Kolkhorst Facebook Page.

Everything about the campaign Facebook page reflects this important dividing line. The page identifies Kolkhorst as a "politician."[1] *See* Exhibit C, About, Lois Kolkhorst's Facebook Page. In the "About" section of her page, users are directed to her campaign website, loisfortexas.com, which is registered to "Lois W. Kolkhorst, State Senator," the formal name of the campaign at the time of the

---

[1] At one time the page did identify Kolkhorst as a "Government Official." That designation was nothing more than an accurate description of Kolkhorst's position and did not signify or imbue the page with any "official" character. To the contrary, as referenced herein, the description of Kolkhorst's position was immediately followed by the plain disclaimer that the page as a "Campaign page, not official government page." *See* Doc. 1-4. Nevertheless, out of an abundance of caution, the campaign updated the page to its current designation of "Politician."   Ex. A ¶ 6.

registration. *Id.*; Ex. A ¶ 5. Kolkhorst proudly describes herself as a "Wife, Mother, Senator, Small Business Owner, Proven Conservative, 5th Generation Texan & TCU Horned Frog." Ex. C. Beneath that, the page is straightforward and unequivocal: "Campaign page, not official government page." *Id.* Kolkhorst posts on a wide variety of topics, including "matters such as meeting with constituents, the passing of legislation that affects her district, family pictures or sharing a quote from scripture that stood out to her at church that day." Ex. A ¶ 7. Just recently, for example, the Kolkhorst campaign posted a photo of Kolkhorst's son attendance at his high school's prom, quotes from the Bible, an ode to Mother's Day, a photo of Kolkhorst getting a haircut, and a message of thanks to the United States military. Exhibit D, Compilation of Facebook Posts.

Kolkhorst has used her Facebook page, before and after assuming office, to campaign for election and subsequently, for reelection. In 2016, Kolkhorst ran for reelection against Libertarian candidate Kathie Stone. *Id.* ¶ 9. During that campaign, Kolkhorst posted messages to her supporters, encouraged them to vote, and, generally, conveyed the campaign's message that Kolkhorst deserved a full term in office. *Id.* In that election, Kolkhorst received over 85% of the vote. *Id.* Kolkhorst is running for reelection in 2020 and intends to use her Facebook page as a significant part of her outreach to potential voters. *Id.* ¶ 10. Her campaign staff also seeks to ensure that the page does not serve as a host to any form of harassment, name-calling, vulgarity, bullying, or threat to any person. *Id.* ¶ 11. Thus, occasionally persons are blocked from the page for violating these standards. *Id.*

**C.    Plaintiff posted aggressive comments on Kolkhorst's Facebook page, which the Kolkhorst campaign removed.**

Plaintiff Lani Clark is a Texas resident with an avid interest in Texas politics. She founded a page called "Texas Bill Watchers" for Texans who are interested in following the mechanisms of the Texas Legislature. Exhibit E, Deposition of Lani Clark at 24:2-6. She admits that she has denied users the opportunity to leave comments on the "Texas Bill Watchers" page that are inconsistent with the

page's purpose, and has also required all posts to the page to be pre-approved before they are viewable to the public. *Id.* at 25:18-25–26:1-15. She has at least two personal Facebook pages: one in which she posts under the name "Lulu Clark," and one in which she previously posted under the name "Zelda Sukit," although it is now registered under "Zelda Williams." *Id.* at 23:10-25. She explained in her deposition that one of the potential benefits of posting as "Lulu Clark," as opposed to her legal name, "Lani Clark," is the anonymity of using a slightly altered name. *Id.* at 45:24-25–46:1-5. Plaintiff acknowledged that she created the "Zelda Sukit" page when she was unable to access her "Lulu Clark" page because she was put in "Facebook jail," a term referencing a scenario in which Facebook blocks a user from accessing the platform due to violations of Facebook standards. *Id.* at 22:11-15. Eventually, Facebook allowed Plaintiff to continue using the "Lulu Clark" page. *Id.* at 23:6-9.

In March 2017, Kolkhorst posted an article to her Facebook page about the Texas Privacy Act (SB 6), pending legislation that she had co-authored. Doc. 14, Plaintiff's Amended Complaint ¶ 34. The post generated over 1,300 user comments. Ex. A ¶ 12. Plaintiff, posting through the account Lulu Clark, does not recall exactly what she posted in the comment section of the post, but believes that what she wrote is the following:

> The truth? OK - here is the truth - have you ever asked WHY it is the Bible frowns on homosexual acts (NOT people)? It's because it can't result in procreation. This is the VERY SAME SIN heterosexuals commit when they use any form of birth control and the same thing when one masturbates - you are "spilling seed," as it is said in the Bible. And yet, you don't spew the same amount of hatred (whatever happened to "love thy neighbor" - it does NOT say "love thy straight neighbor") toward heterosexual couples who use birth control or those who masturbate. You are USING the Bible to justify your hatred of someone who is different – NOT something Jesus would do. Why don't you pray on THAT?

> http://www.upworthy.com/there-are-6-scriptures-about-homosexuality-in-the-bible-heres-what-they-really-say

> http://www.vatican.va/archive/ccc_css/archive/catechism/p3s2c2a6.htm

> "2357 Homosexuality refers to relations between men or between women who experience an exclusive or predominant sexual attraction toward persons of the same sex. It has taken a great

variety of forms through the centuries and in different cultures. Its psychological genesis remains largely unexplained. Basing itself on Sacred Scripture, which presents homosexual acts as acts of grave depravity, tradition has always declared that "homosexual acts are intrinsically disordered." They are contrary to the natural law. They close the sexual act to the gift of life. They do not proceed from a genuine affective and sexual complementarity. Under no circumstances can they be approved.

Catechism #2358: The number of men and women who have deep-seated homosexual tendencies is not negligible. This inclination, which is objectively disordered, constitutes for most of them a trial. They must be accepted with respect, compassion, and sensitivity. Every sign of unjust discrimination in their regard should be avoided. These persons are called to fulfill God's will in their lives and, if they are Christians, to unite to the sacrifice of the Lord's Cross the difficulties they may encounter from their condition."

Exhibit F (produced in discovery by Plaintiff as CLA-000001); Ex. E at 51:2-6. This was not Plaintiff's only post about this subject. Plaintiff interrupted posts and threads with Kolkhorst's supporters by interjecting comments and criticisms on topics separate from, and unrelated to, the specific post. Ex. A ¶ 13. When Kolkhorst's supporters would post their thoughts or opinion on the topic of the post, Plaintiff would reply with unrelated comments to draw an argument and take the discussion off the posted topic or message conveyed by the campaign's post. Id. For example, a supporter might post a comment about a posted scripture verse or family picture, only to be challenged by Plaintiff on Kolkhorst's support for the so-called "Bathroom Bill." Id. The Lois Kolkhorst campaign was concerned that this behavior had a chilling effect on others' ability to participate and comment on the page. After Plaintiff continued posting comments that were disruptive and inconsistent with the message and purpose of the campaign page, the Lois Kolkhorst Campaign blocked the "Lulu Clark" account from being able to comment directly on the campaign page. Id.

At that point, Plaintiff appears to have encouraged her friends to bombard the Kolkhorst page with the hashtag "#unblockluluclark." Ex. E at 61:3-19. She also used her alternative account, under the name Zelda Sukit, to complain about being blocked from commenting on the Kolkhorst page. Id. at 55:11-25. That account—the "Zelda Sukit" page (or "Zelda Williams," as it is now registered)—

remains free to comment on any post on the campaign Facebook page. Ex. A ¶ 14. Indeed, Plaintiff admits that she has no knowledge of whether this other account is blocked from fully engaging with the Kolkhorst Facebook page. Ex. E at 77:18-21.

When Plaintiff reached out to the Senate office to discuss this issue, the office confirmed what is stated on the Facebook page: Kolkhorst's Facebook page is operated by her campaign, not by her Senate staffers. Doc. 14 ¶¶ 47–49.  Plaintiff next contacted the campaign, which declined to reinstate the Lulu Clark account, but informed Plaintiff that she was still free to "petition your government, and in this case Senator Kolkhorst's state office via phone call, email, fax, mail or by visiting any of her four physical offices including the Capitol or three district offices." Id. ¶ 52. To this day, Plaintiff can contact the Senate office via any of those mechanisms, as she conceded in her deposition. Ex. E at 70:2-25–71:1-15.

Plaintiff raises two claims in her live pleading: first, that by removing Plaintiff's comments and preventing her from commenting on current posts, Kolkhorst violated Plaintiff's rights under the First Amendment. Id. ¶¶ 73–96. Second, Plaintiff contends that she had a due process right under the Fourteenth Amendment to challenge the removal of comments and restriction of commenting privileges from Kolkhorst's page. Id. ¶¶ 97–103. These claims are asserted against Kolkhorst in her official and individual capacities. The sole relief Plaintiff seeks is an injunction unblocking her from the Kolkhorst page.[2] Ex. E at 71:18-24.

### STANDARD OF REVIEW

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986);

---

[2] Plaintiff also claims to seek an injunction preventing others from being banned or blocked on the Kolkhorst page, Ex. E at 71:18-24, but because this is not an overbreadth case challenging the facial constitutionality of a statute, she lacks standing to assert claims on behalf of third parties. See Hoyt v. City of El Paso, Tex., 878 F. Supp. 2d 721, 739 (W.D. Tex. 2012).

FED. R. CIV. P. 56(a). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *id.* at 252 ("mere existence of a scintilla of evidence" is insufficient to defeat summary judgment"). When the burden of proof at trial lies with the nonmoving party, the movant is not required to present evidence to put the plaintiff's claims in issue. *Celotex*, 477 U.S. at 325; *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015). Nor must the movant negate the elements of the nonmovant's case. *See Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2004). Instead, the movant need only "point[] out . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. If the movant meets this obligation, the burden shifts to the plaintiff to produce competent evidence that demonstrates a genuine issue of material fact as to each element of every disputed claim. *Anderson*, 477 U.S. at 247–48, 256–57; *Tran Enters., LLC v. DHL Express (USA), Inc.*, 627 F.3d 1004, 1010 (5th Cir. 2010).

## ARGUMENT

To state a viable claim under 42 U.S.C § 1983, a plaintiff must plausibly assert two allegations: (1) "that some person deprived [her] of a federal right," and (2) that such person "acted under color of state or territorial law." *Gomez v. Toledo*, 446 U.S. 635, 640 (1980). Relief cannot be granted under Section 1983 for injury caused by "merely private conduct, no matter how discriminatory or wrongful." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (citation and quotation marks omitted). "A person acts under color of state law if he misuses power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Bustos v. Martini Club Inc.*, 599 F.3d 458, 464 (5th Cir. 2010) (citation omitted).

This motion addresses the "color of state law" prong first. Kolkhorst is, of course, a public official and Texas State Senator, but she is emphatically not a state actor in the management and

operation of her campaign's Facebook page. The page is run by her campaign for the express and sole purpose of supporting her reelection to the Texas Senate. She is thus not a state actor for purposes of Plaintiff's Section 1983 claim. In the alternative, if Kolkhorst's Facebook page did amount to state action, and it does not, it would constitute government speech, and when the government speaks, it has the right to control the message it disseminates. Moreover, Plaintiff has not been deprived of a federal right, because even to the extent Kolkhorst was acting under color of state law, she is still able to access and post on the Facebook page.

Clark's due process claim can be dismissed because an individual does not have a protected right to comment on a private citizen's social media page, and because the remedy she seeks—a hearing prior to the removal of comments from Kolkhorst's page—would wreak havoc on politicians' operations of their social media accounts and perhaps even render them inoperable. The Due Process Clause does not require this counterproductive outcome.

## A.     Kolkhorst did not act under color of state law.

"[T]here is practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs" and "public issues" through the "exposition" of one's political opinions. *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346 (1995) (quotation marks omitted). These principles are especially true of politicians, because speech that tends to foster "'[d]ebate on the qualifications of candidates' is 'at the core of our electoral process and of the First Amendment freedoms,' not at the edges." *Republican Party of Minn. v. White*, 536 U.S. 765, 781 (2002) (quoting *Eu v. San Francisco Cty. Democratic Central Comm.*, 489 U.S. 214, 222–23 (1989)).

The freedom to express political opinions requires the "autonomy to control one's own speech," including the right "to exclude a message [one does] not like from the communication [one chooses] to make." *Hurley v. Irish-Am. Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557, 574 (1995).

"Indeed, this general rule, that the speaker has the right to tailor the speech, applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid." *Id.* at 573. Courts have thus long protected politicians' rights to speak and to control their messages, even when they are elected officials, and even when the speech relates to their public duties.

In *Sistrunk v. City of Strongsville*, 99 F.3d 194, 196 (6th Cir. 1996), for example, a citizen's pro-Clinton message was banned from a rally for President Bush being held in the city's public square. The citizen filed suit alleging that this exclusion violated her freedom of expression. *Id.* The court rejected her argument, holding that although the First Amendment guarantees "access to the Commons for expressive activity," it also protects the right of speakers "seeking to make exclusive use of [a portion of] the Commons" and does not require them "to *include* discordant speakers in [their] expressive activity." *Id.* at 198. The court recognized that the Clinton supporter's participation "would alter the [pro-Bush] message the organizers sent to the media and other observers." *Id.* at 199. Her exclusion did not diminish her ability to disseminate her message or speak in the Commons, because, as the court noted, she "could have stood with her button on the sidewalk leading up to the rally to express her support for Clinton." *Id.* at 199.

Other federal courts have likewise recognized that citizens have the right to express the message of their own choosing at campaign events without being subjected to interference by other citizens. *See Schwitzgebel v. City of Strongsville*, 898 F. Supp. 1208, 1218 (N.D. Ohio 1995) (citing *Sanders v. United States*, 518 F. Supp. 728, 729–30 (D.D.C. 1981), *aff'd without op.*, 679 F.2d 262 (D.C. Cir. 1982)). In *Schwitzgebel*, the plaintiffs complained that they were excluded from a permitted campaign event based on expression critical of the candidate. The court identified the interests supporting such restrictions as being two-fold. *Id.* The first concerned the safety and convenience of those other

citizens already participating in the event. *Id.* The court held that in considering this justification, it must consider not only the impact of the one party before the court, but the cumulative impact caused by all persons who would wish to invoke the right of expression. *Id.* Secondly, the court recognized the interest in guaranteeing citizens the right to participate in events or demonstrations of their own choosing without being subjected to interference by other citizens. *Id.* A physical intrusion into another's event for the purpose of interjecting one's own convictions or beliefs is by definition an interference, regardless of how insubstantial or insignificant it may seem. *See Sanders*, 518 F. Supp. at 729–30.

By analogy, Kolkhorst's campaign Facebook page is the internet equivalent of the physical campaign events in the foregoing cases. Facebook is a private entity that permits individuals to use portions of its site in accordance with its terms of use. *See generally Bevin*, 298 F. Supp. 3d at 1006–07. The campaign provides its Facebook page as a means of communicating with its supporters and both the campaign and supporters have the right to express their message free from the interference of discordant messages. It is well-established that individuals, even those seeking to engage in political speech or protest, have no First Amendment right to disseminate their messages on another's private property, even property that is generally open for public access. *See Lloyd Corp., Ltd. v. Tanner*, 407 U.S. 551, 570 (1972) (holding that protesters could be excluded from shopping mall). Kolkhorst does not relinquish her constitutional right to exclude disfavored speech simply by allowing limited third-party commenting on her Facebook page. At any time, she retains the authority to remove messages she disfavors and exclude commenters who seek to utilize her page beyond the scope of any implicit invitation. *See Lloyd Corp.*, 407 U.S. at 564–66. And Plaintiff's limited exclusion from the campaign website does not diminish her ability to disseminate her opinions, as Plaintiff is free to start her own

political Facebook page (and indeed, has already done so), or comment on other pages and social media platforms that are not owned, financed and controlled by the Kolkhorst campaign.

Moreover, contributing to the administration of a Facebook page (let alone this Facebook page) is not among any actual or apparent duties of a Texas State Senator. Kolkhorst's involvement with the Facebook page is a form of campaigning, self-promotion, and expression, done in her individual capacity as a long-serving politician. *See generally* Ex. A.

Clark appears to argue that because the Facebook page posts some information about Kolkhorst's policies and initiatives as a senator, it must be administered pursuant to official government business. *E.g.*, Doc. 14 ¶¶ 26–27. But that is not so. For example, "when public officials deliver public speeches" and include religious blessings, they are understood not to have transgressed the Establishment Clause because "we recognize that their words are not exclusively a transmission from *the* government because those oratories have embedded within them the inherently personal views of the speaker as an individual member of the polity." *Van Orden v. Perry*, 545 U.S. 677, 723 (2005) (Stevens, J., dissenting). And in any event, courts have found that elected officials may operate private social media accounts, including campaign pages, notwithstanding the fact that those pages relate to or reference their official activities. *See, e.g.*, *Fehrenbach v. Zeldin*, 2019 WL 1322619, at *5 (E.D.N.Y. Feb. 6, 2019), *rec. adopted* 2019 WL 1320280 (E.D.N.Y. Mar. 21, 2019) (granting a motion to dismiss on the basis that a Congressman's removal from his campaign Facebook page of a posting critical of legislation was a private action and therefore did not implicate the First Amendment); *German v. Eudaly*, 2018 WL 3212020, at *6 (D. Or. June 29, 2018) (finding that a city commissioner's Facebook post about events that occurred while she was working "does not transform her non-official page into a page operated under color of state law").

Nor is this a case in which a politician has "swathed" her Facebook page "in the trappings of her office." *See Davison v. Randall*, 912 F.3d 666, 680 (4th Cir. 2019). In *Davison*, the Fourth Circuit noted that a politician, Phyllis Randall, acted under color of state law in operating a Facebook page, when, among other factors, "(1) the title of the page includes Randall's title; (2) the page is categorized as that of a government official; (3) the page lists as contact information Randall's official County email address and the telephone number of Randall's County office; (4) the page includes the web address of Randall's official County website; (5) many—perhaps most—of the posts are expressly addressed to 'Loudoun,' Randall's constituents; (6) Randall has submitted posts on behalf of the Loudoun Board as a whole; (7) Randall has asked her constituents to use the Chair's Facebook Page as a channel for 'back and forth constituent conversations'; and (8) the content posted has a strong tendency toward matters related to Randall's office." *Id.* at 681 (internal brackets omitted); *see also, e.g.*, *Knight First Amend. Inst. at Colum. Univ. v. Trump*, 302 F. Supp. 3d 541, 567 (S.D.N.Y. 2018) (finding President Trump's Twitter account was "governmental" where President Trump's tweets were required to be preserved under Presidential Records Act and President Trump used account for "squarely executive functions" such as the appointment and removal of officers).

By contrast, Kolkhorst's Facebook page does not describe her as "Senator Lois Kolkhorst" but simply as "Lois Kolkhorst," *see* Ex. C; the page lists her as a politician, rather than a government official, *see id.*; followers are directed to her campaign website, rather than any official government website, *see id.*; the page expressly states that it is "not a government page," *see id.*; Facebook informs users for transparency purposes that the Lois W. Kolkhorst Campaign operates the page, *see* Ex. B; and Kolkhorst frequently uses the page to communicate about items having nothing to do with politics. *See* Ex. D; *see also* Ex. E at 78:16-25–79:1 (conceding that several of Kolkhorst's posts from May 2020 do not relate to official government functions). Further, Clark has not advanced plausible

allegations or evidence that Kolkhorst has performed any official duties of her office through her Facebook page. Nor could she. The purpose of the Facebook page is to promote the Lois Kolkhorst Campaign. *See* Ex. A ¶¶ 8, 10. The page is operated and financed exclusively by the Kolkhorst campaign and receives no government support. *Id.* ¶¶ 3–4; *see also* Ex. B. To the contrary, the campaign has expended significant resources employing media consultants to operate the page as a platform to serve Kolkhorst's election and re-election efforts. *Id.* ¶ 4. For these reasons, the page does not direct Facebook users to Kolkhorst's Senate website, but to "loisfortexas.com," which is a campaign webpage, paid for with campaign funds, and used to solicit support and funds for Kolkhorst's electoral efforts. *Id.* ¶ 5. Indeed, the website includes the words "Volunteer on the campaign" on the main page, and a disclaimer with the words "Pol. adv. paid for by Lois W. Kolkhorst Campaign" at the bottom of every page. *See* Exhibit G, loisfortexas.com (accessed July 15, 2020).

Plaintiff conflates politicians' statements promoting their political agenda or accomplishments—for example, posting an article in support of a piece of legislation—with the official duties of public office. That reasoning produces irrational results. Under such a theory, when an incumbent politician engages in campaigning, participates in networking events, or even discusses her political accomplishments at a barbeque, she could be said to be acting under color of law. On the other hand, when a politician who is not currently holding public office does these exact same activities, she is acting as a private individual. The First Amendment does not distinguish in this manner between the free speech rights of aspiring and incumbent officeholders. Plaintiff's theory of liability, if ultimately successful, would elevate private citizens' speech over that of elected officials. But the Supreme Court has long since rejected such a distinction between citizens and public officials, concluding that there is "no support" for it in First Amendment jurisprudence. *Bond v. Floyd*, 385 U.S. 116, 136 (1966) ("The interest of the public in hearing all sides of a public issue is hardly advanced by

extending more protection to citizen-critics than to [public officials].”). Politicians do not surrender their First Amendment rights upon election; in fact, “[t]he role that elected officials play in our society makes it all the more imperative that they be allowed freely to express themselves on matters of current public importance.” *Republican Party of Minn.*, 536 U.S. at 781–82 (quoting *Wood v. Georgia*, 370 U.S. 375, 395 (1962)).

For all of these reasons, Kolkhorst has not acted under color of state law in operating a private Facebook page, and thus, there can be no official capacity action asserted against her.

**B.      In the alternative, if Kolkhorst did act under color of law, her Facebook page represents government speech.**

The Court can soundly reject Clark's First Amendment because the summary judgment evidence establishes—beyond any genuine issue of material fact—that Kolkhorst does not operate her campaign page under the color of state law. But, even if the Court concludes that the Facebook page constitutes speech in Kolkhorst's official capacity, dismissal is required because the page (and the moderation of comments on the page) would constitute government speech. If Kolkhorst were administering the Facebook page in her official capacity as Texas State Senator, then the page would amount to “the Government's own speech,” which is “exempt from First Amendment scrutiny,” *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 553 (2005). And because Kolkhorst's speech is government speech, the Court need not engage in an analysis of whether Kolkhorst's Facebook page is a public or limited public forum, as that distinction is irrelevant in the government speech context. *See Walker v. Texas Division, Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239, 2250 (2015) (“[F]orum analysis is misplaced here. Because the State is speaking on its own behalf, the First Amendment strictures that attend the various types of government-established forums do not apply.”); Doc. 14 ¶ 31 (asserting that Kolkhorst's Facebook page is “a designated public forum, or alternatively, a limited public forum.”).

In *Bevin*, the United States District Court for the Northern District of Kentucky declined to issue an injunction that would have required Kentucky's governor to un-block users on Twitter and Facebook and refrain from blocking them in the future. The court concluded that the Governor's social media accounts were subject to the government speech analysis set out in *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460 (2009) and *Walker. See Bevin*, 298 F. Supp. 3d at 1012 (citing *Summum*, 555 U.S. at 479 (permanent monuments in city park were government speech not subject to First Amendment); *Walker*, 135 S. Ct. at 2251 (State-issued specialty license plates were government speech not subject to First Amendment)).

Under the government speech doctrine, the government is not subject to the First Amendment when selecting the expressive conduct it wishes to be associated with. *See id.* The district court in *Bevin* concluded that the Governor's expressive conduct on social media is not subject to the First Amendment, but instead, that "Governor Bevin is permitted to cull his desired message through his Facebook and Twitter page," and "is not required to allow the public to speak for him." *Id. at* 1013.

The Court should follow the analysis in *Bevin*. Kolkhorst's Facebook page is a "means for communicating [her] own speech, not for the speech of [her] constituents." *Id.* at 1011. She never intended her Facebook page "to be like a public park, where anyone is welcome to enter and say whatever they want; [she] has a specific agenda of what [she] wants [her] pages to look like and what the discussion on those pages will be." *Id.* And she has removed comments from the page that constitute "harassment, name-calling, vulgarity, bullying, or threat to any person(s)." Doc. 14 ¶ 52. Kolkhorst "is not required to allow the public to speak for [her]." *Bevin*, 298 F. Supp. 3d at 1013. Instead, she is allowed, consistent with the First Amendment, to decide the content of her own campaign page designed to convince Texans that she is fulfilling her duties to her constituents. Those same constituents do not have the right to decide how she frames her own campaign ideas and

contributions to the Texas Legislature. *See id.* ("Governor Bevin only wants to prevent some messages from appearing on his own wall and, relatedly, to not view those messages he deems offensive. Blocking only prevents their direct relationship to Governor Bevin's Facebook and Twitter pages, and a person's right to speak is not infringed when government simply ignores that person while listening to others.") (citation and quotation marks omitted). Accordingly, the Court should dismiss Clark's First Amendment claim.

## D.      Plaintiff has not established an ongoing violation of her First Amendment rights.

Because Kolkhorst is a state actor in her official capacity, sovereign immunity bars any claim against her unless an exception to immunity applies. The only such exception that would apply here is the *Ex parte Young* doctrine. And to determine whether *Ex parte Young* circumvents the Eleventh Amendment's bar to suit, a court conducts a "straightforward inquiry into whether the complaint alleges an *ongoing* violation of federal law and seeks relief properly characterized as prospective." *Verizon Md., Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (emphasis added). The only relief that Plaintiff seeks in this case is the right to comment on the Kolkhorst Facebook page as "Lulu Clark". <u>Ex. E</u> at 71:18-24. But Plaintiff already has a Facebook account, under the name Zelda Sukit, that is not blocked from the Kolkhorst page. Under these circumstances, Plaintiff has not alleged an ongoing constitutional violation sufficient to maintain her claim for declaratory and injunctive relief.

Nor can Plaintiff complain of an inability to post comments in her own name, as she did not comment in her own name in the first instance. Rather, Plaintiff posted as "Lulu Clark," instead of "Lani Clark," at least in part, because of the anonymity the blurring of her name afforded her. Thus, at best, Plaintiff's claims baselessly seek to constitutionalize her ability to comment under one pseudonym rather than another. But Plaintiff cannot plausibly claim a First Amendment interest in posting as "Lulu Clark" as opposed to "Zelda Sukit," or any other created name as both accounts

provide Plaintiff with anonymity in using Facebook. So long as she has access to the page, she cannot plausibly allege an ongoing constitutional harm.

### E.    Plaintiff has no due process right to challenge the removal of commenting privileges.

In her second cause of action, Plaintiff contends that she has a due process right to challenge the removal of comments from posts of Kolkhorst's Facebook page. Doc. 14 ¶¶ 97–103. This claim fails because, for the reasons addressed above, Kolkhorst was not acting, and is not acting, under color of state law, and in the alternative, her Facebook page is government speech. *See Sullivan*, 526 U.S. at 50 (explaining that relief cannot be granted under Section 1983 for injury caused by "merely private conduct, no matter how discriminatory or wrongful"). But even if the Court rejects these contentions, Plaintiff's due process claim would still fail.

"[D]ue process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Davison v. Loudon County Bd. of Supervisors*, 267 F. Supp. 3d 702, 719 (E.D. Va. 2017) (quoting *Cafeteria & Rest. Workers Union, Local 473, AFL–CIO v. McElroy*, 367 U.S. 886, 895 (1961)). Rather, "due process is flexible and calls for such procedural protections as the particular situation demands." *Id.* (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)).

Plaintiff's request for a pre-deprivation notice and opportunity to be heard, Doc. 14 ¶¶ 97–103, prior to her comments being removed from a Facebook page would be practically unworkable. Ex. A ¶ 15 (explaining the significant time it would take for the Kolkhorst campaign to notify each individual before taking down a comment). It would "unduly burden the speech of [Texas] officials and employees, and could in fact violate their First Amendment rights." *Davison*, 267 F. Supp. 2d at 719. Moreover, any First Amendment interest that Plaintiff has on commenting on Kolkhorst's page is "relatively weak," given the many options Plaintiff has to share her views, including posting on her own Facebook page. *See id.* at 721. Plaintiff's stated First Amendment claim is further weakened by

the fact that she currently has access to comment on and engage with the full content of the Kolkhorst page under her other Facebook account. Ex. A ¶ 14.

Moreover, "government officials have at least a reasonably strong interest in moderating discussion on their Facebook pages in an expeditious manner. By permitting a commenter to repeatedly post inappropriate content pending a review process, a government official "could easily fail to preserve their online forum for its intended purpose." *Davison*, 267 F. Supp. 2d at 721. For these reasons, providing pre-deprivation notice is "impracticable," *see id.*, and could "spell the end of social media websites like [Lois Kolkhorst's] Facebook page as [a] tool[] of civic discourse." *Id.* Accordingly, Clark has not established a viable due process claim and it should be dismissed.

### D.   Kolkhorst is entitled to dismissal of Plaintiff's individual capacity claims.

Plaintiff has made clear that she "is seeking only injunctive and declaratory relief, not monetary damages." Doc. 36 at 10, Report and Recommendation at 10. The Magistrate Judge's earlier Report and Recommendation correctly noted that "[t]o the extent Clark seeks an injunction to control official state action, Kolkhorst is correct that such relief could be maintained only against Kolkhorst in her official capacity." *Id.* at 12. On its face, the declaratory and injunctive relief Plaintiff requests is clearly sought against Kolkhorst in her official, rather than her individual, capacity. Plaintiff's entire suit is predicated on the assertion that Kolkhorst operates the Lois Kolkhorst Facebook page as an official public page of her Senate office. Doc. 14 ¶ 17. Consequently, Plaintiff does not seek relief against Kolkhorst in her individual capacity, but rather requests "[p]reliminary and permanent injunctive relief enjoining Defendant and her employees, agents, servants, officers, and persons in concert with Defendant, from removing, censoring, or otherwise restricting protected speech on the public Kolkhorst Facebook page." Doc. 14 at 25.

As explained at length above, Plaintiff is incorrect in her argument that operation of the

Kolkhorst Facebook page constitutes government action. But to the extent the Court disagrees, Plaintiff's requested relief is plainly intended to control the operation of a government social media site and would therefore be a suit to control state action. Such a claim may be maintained only against a state official in her official capacity. *See e.g.*, *Greenawalt v. Indiana Dep't of Corrections*, 397 F.3d 587, 589 (7th Cir. 2005) ("[S]ection 1983 does not permit injunctive relief against state officials sued in their individual as distinct from their official capacity."). "Section 1983 plaintiffs may sue individual-capacity defendants only for money damages and official-capacity defendants only for injunctive relief." *Brown v. Montoya*, 662 F.3d 1152, 1161 n.5 (10th Cir. 2011) (citing *Hafer v. Melo*, 502 U.S. 21, 30 (1991)).

For these reasons, Plaintiff's individual capacity claims should be dismissed.

## CONCLUSION

Defendant respectfully requests that the Court grant this motion for summary judgment and dismiss Plaintiff's claims.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

RYAN L. BANGERT
Deputy First Assistant Attorney General

DARREN L. MCCARTY
Deputy Attorney General for Civil Litigation

THOMAS A. ALBRIGHT
Chief, General Litigation Division

*/s/ Michael R. Abrams*
MICHAEL R. ABRAMS
Texas Bar No. 24087072
Assistant Attorney General
Office of the Attorney General
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Phone: 512-463-2120
Fax: 512-320-0667
Michael.Abrams@oag.texas.gov

**Counsel for Senator Lois Kolkhorst in her
Official Capacity**

BICKERSTAFF HEATH
DELGADO ACOSTA LLP
3711 S. MoPac Expressway
Building One, Suite 300
Austin, Texas 78746
Telephone: (512) 472-8021
Facsimile:  (512) 320-5638

By: */s/ Gunnar P. Seaquist*
Gunnar P. Seaquist
State Bar No: 24043358
gseaquist@bickerstaff.com

**Counsel for Senator Lois Kolkhorst in her
Individual Capacity**

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the foregoing document was served upon Plaintiff Lani E. Clark via the Court's CM/ECF system on July 17, 2020.

/s/ *Michael R. Abrams*
MICHAEL R. ABRAMS